FRANK S. HEDIN
ELLIOT O. JACKSON
**HEDIN LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131-3302
Telephone:  (305) 357-2107
Facsimile:  (305) 200-8801
E-Mail:      fhedin@hedinllp.com
                   ejackson@hedinllp.com

DAVID W. SCOFIELD – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:  (801) 322-2002
Facsimile:  (801) 912-0320
E-Mail:      dws@psplawyers.com

*Counsel for Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SHANNON ARNSTEIN; DANA BASSETT; DEBRA MACKLIN; and ELIZABETH WUEBKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUNDANCE HOLDINGS GROUP, L.L.C.,<br><br>Defendant. | Case No. 2:24-cv-00344<br><br>**CLASS ACTION COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

Shannon Arnstein ("Plaintiff Arnstein"), Dana Bassett ("Plaintiff Bassett"), Debra Macklin ("Plaintiff Macklin"), and Elizabeth Wuebker ("Plaintiff Wuebker") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## INTRODUCTION

1.      Defendant Sundance Holdings Group, L.L.C. ("Sundance") rented, sold, and/or otherwise disclosed for compensation detailed information about Plaintiffs' purchases of Sundance products—including their full names, home addresses, the fact that they are Sundance customers, and the products and the dollar amount of the products they purchased (collectively "Private Purchase Information")—to data aggregators, data appenders, data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and various other third parties.  As a result, Plaintiffs have received a barrage of unwanted junk mail.  By renting, selling, and/or otherwise disclosing for compensation Plaintiffs' Private Purchase Information, without providing Plaintiffs prior notice of these disclosures, Sundance violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37 (the "NISNPIA").

2

2.      Documented evidence confirms these facts. For example, on the website of Nextmark, Inc. ("Nextmark"), Sundance offers to sell or rent, to any member of the public interested in purchasing it, the "Sundance Catalog Mailing List", which as of May 2024 contained the Private Purchase Information of 552,441 of Sundance's recent U.S. purchasers, at a base price of "$120.00/M [per thousand]," i.e., 12 cents apiece, as shown in the screenshot below:



*See* **Exhibit A** hereto.

3.     By renting, selling, or otherwise disclosing for compensation the Private Purchase Information of its customers to third parties, without providing its customers prior notice of such practices, Sundance violated the NISNPIA. Subsection 2 of the NISNPIA provides:

> A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with [the provisions requiring that prior notice of such disclosures be provided to the consumer, as set forth in] Section 13-37-201.

Utah Code Ann. § 13-37-202(1).

4.     Accordingly, Plaintiffs bring this Class Action Complaint against Sundance for its intentional, systematic, and unlawful conduct in violation of the NISNPIA.

## NATURE OF THE CASE

5.     To supplement its revenues, Sundance rents, sells and otherwise discloses for compensation all of its customers' Private Purchase Information (including their full names, home addresses, the fact that they are Sundance customers, and the products and the dollar amount of the products they purchased)— as well as myriad other categories of individualized data and demographic information such as gender, religion, and ethnicity—to data aggregators, data appenders, data cooperatives, and other third parties without providing prior notice to (let alone obtaining the consent of) its customers.

4

6.      Sundance's disclosures of Private Purchase Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particular members of society.  For example, anyone could purchase from Sundance a list containing the names and addresses of all Asian women in California over the age of 60 who are members of the Christian religion and who purchased more than $200 worth of products from Sundance. Such a list is available for sale for approximately $210.00 per thousand customers listed.

7.      While Sundance profits handsomely from the unauthorized rentals, sales, and other compensation-driven disclosures of its customers' Private Purchase Information, it does so at the expense of its customers' statutory privacy rights (afforded by the NISNPIA) because Sundance does not provide any notice of such disclosures to its customers (much less obtain their consent) prior to disclosing their Private Purchase Information to third parties for compensation.

## PARTIES

I.      **Plaintiff Arnstein**

8.      Plaintiff Arnstein is a natural person and a citizen and resident of Muncie, Indiana.

9.      On or after January 1, 2004, including on or about April 26, 2024, Plaintiff Arnstein purchased consumer products from Sundance on its website, www.sundancecatalog.com.

10.     Prior to and at the time Plaintiff Arnstein made her purchases, Sundance did not notify Plaintiff Arnstein that it discloses the Private Purchase Information of its customers, and Plaintiff Arnstein has never authorized Sundance to do so. Furthermore, Plaintiff Arnstein was never provided any written notice that Sundance rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

11.      Sundance completed its sales of goods to Plaintiff Arnstein by shipping the goods she purchased to the address she provided in her order.  Sundance shipped the goods purchased by Plaintiff Arnstein from a location within Utah.

12.     After completing these sales to Plaintiff Arnstein, and during the applicable statutory period, Sundance sold, rented, or otherwise disclosed for compensation, without providing Plaintiff Arnstein the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Arnstein's Private Purchase Information to data aggregators, data appenders, data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and other third parties.

## II.     Plaintiff Bassett

13.     Plaintiff Bassett is a natural person and a citizen and resident of Eugene, Oregon.

14.     On or after January 1, 2004,  including on or about February 22, 2024,

Plaintiff Bassett purchased consumer products from Sundance on its website, www.sundancecatalog.com.

15.     Prior to and at the time Plaintiff Bassett made her purchases, Sundance did not notify Plaintiff Bassett that it discloses the Private Purchase Information of its customers, and Plaintiff Bassett has never authorized Sundance to do so. Furthermore, Plaintiff Bassett was never provided any written notice that Sundance rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

16.     Sundance completed its sales of goods to Plaintiff Bassett by shipping the goods she purchased to the address she provided in her order.  Sundance shipped the goods purchased by Plaintiff Bassett from a location within Utah.

17.     After completing these sales to Plaintiff Bassett, and during the applicable statutory period, Sundance sold, rented, or otherwise disclosed for compensation, without providing Plaintiff Bassett the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Bassett's Private Purchase Information to data aggregators, data appenders, data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and other third parties.

### III.   Plaintiff Macklin

18.     Plaintiff Macklin is a natural person and a citizen and resident of

Alexandria, Virginia.

19.    On or after January 1, 2004, including on or about December 31, 2023, Plaintiff Macklin purchased consumer products from Sundance on its website, www.sundancecatalog.com.

20.    Prior to and at the time Plaintiff Macklin made her purchases, Sundance did not notify Plaintiff Macklin that it discloses the Private Purchase Information of its customers, and Plaintiff Macklin has never authorized Sundance to do so. Furthermore, Plaintiff Macklin was never provided any written notice that Sundance rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

21.    Sundance completed its sales of goods to Plaintiff Macklin by shipping the goods she purchased to the address she provided in her order.  Sundance shipped the goods purchased by Plaintiff Macklin from a location within Utah.

22.    After completing these sales to Plaintiff Macklin, and during the applicable statutory period, Sundance sold, rented, or otherwise disclosed for compensation, without providing Plaintiff Macklin the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Macklin's Private Purchase Information to data aggregators, data appenders, data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and other third parties.

8

IV.    **Plaintiff Wuebker**

23.    Plaintiff Wuebker is a natural person and a citizen and resident of Austin, Minnesota.

24.    On or after January 1, 2004, including on or about July 29, 2023, Plaintiff Wuebker purchased consumer products from Sundance on its website, www.sundancecatalog.com.

25.    Prior to and at the time Plaintiff Wuebker made her purchases, Sundance did not notify Plaintiff Wuebker that it discloses the Private Purchase Information of its customers, and Plaintiff Wuebker has never authorized Sundance to do so.  Furthermore, Plaintiff Wuebker was never provided any written notice that Sundance rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

26.    Sundance completed its sales of goods to Plaintiff Wuebker by shipping the goods she purchased to the address she provided in her order.  Sundance shipped the goods purchased by Plaintiff Wuebker from a location within Utah.

27.    After completing these sales to Plaintiff Wuebker, and during the applicable statutory period, Sundance sold, rented, or otherwise disclosed for compensation, without providing Plaintiff Wuebker the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Wuebker Private Purchase Information to data aggregators, data appenders, data cooperatives, list brokers, aggressive advertisers,

direct-marketing companies, political organizations, non-profit companies, and other third parties.

### V.     Defendant Sundance Holdings Group, L.L.C.

28.     Defendant Sundance Holdings Group, L.L.C. is a limited liability company, organized and existing under the laws of the State of Delaware, that maintains its headquarters and principal place of business at 3865 W 2400 South, Salt Lake City, UT 84120.

29.     Sundance is a specialty retailer that sells a variety of clothing and other household products to consumers.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Sundance.

31.     The Court has personal jurisdiction over Sundance and venue is proper in this judicial District because Sundance maintains its headquarters and principal place of business in Salt Lake City, Utah, within this judicial District.

## FACTUAL BACKGROUND

### *Utah's Notice of Intent to Sell Nonpublic Personal Information Act*

32.     Pursuant to the NISNPIA, "[a] commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201." Utah Code Ann. § 13-37-202.

33.     A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

34.     "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition . . . of[] goods[,] services[,] or other tangible or intangible property, . . . that is initiated or completed in [Utah]." *Id.* § 13-37-102(4)(a)(i).

35.     "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv).

36.     A commercial entity "is considered to have obtained information as a

11

result of a consumer transaction if . . . the person provides the information to the commercial entity . . . at any time during the consumer transaction . . . and at the request of the commercial entity," or if "the commercial entity otherwise obtains the information . . . and but for the consumer transactions, the commercial entity would not obtain the information." *Id.* § 13-37-201(1)(b).

37.    Section 13-37-201 of the NISNPIA requires a commercial entity to provide the consumer with a notice, in the form set forth in that section, if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction . . . , the commercial entity obtains nonpublic personal information concerning that person[,] and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information . . . to a third party . . . for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," is "directly related to the commercial entity disclosing the nonpublic personal information," and "is not compensation received by the commercial entity in consideration of a transaction [wherein a third party provides the commercial entity with: "(i) services, including business outsource services; (ii) personal or real property; or (iii) other thing of value"])." *Id.* § 13-37-201(1)(a); § 13-37-201(5).

38.    The notice required by section 13-37-201 of the NISNPIA "shall read substantially as follows: 'We may choose to disclose nonpublic personal

information about you, the consumer, to a third party for compensation." )." *Id.* § 13-37-201(3)(a).  The notice may be provided either "orally, if the consumer transaction itself is entirely conducted orally[,] or . . . in writing, if the notice is written in dark bold." *Id.* § 13-37-201(3)(b).  In either case, the notice "shall be sufficiently conspicuous so that a reasonable person would perceive the notice before providing the nonpublic personal information."  *Id.* § 13-37-201(3)(c). The notice "shall be given before the earlier of . . . the point at which the person is requested to provide the nonpublic personal information[] or . . . the commercial entity otherwise obtains the nonpubllic personal information as a result of the consumer transaction[.]" *Id.* § 13-37-201(2).

39.     The NISNPIA entitles consumers who suffer violations of the statute to recover, *inter alia*, "$500 for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action." *Id.* § 13-37-203.

40.     Despite the fact Sundance has completed hundreds of thousands of sales of its products in Utah, Sundance disregarded its legal responsibilities to its customers by systematically disclosing their Private Purchase Information to third parties for compensation, in clear violation of the NISNPIA.

### *The Private Information Market: Consumers' Private Information Has Real Value*

41.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson

13

Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

42.     More than two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

43.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

---

[1]     **Exhibit B**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[2]     *See* **Exhibit C**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 30, 2021).

[3]     **Exhibit D**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021) (emphasis added).

44.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

45.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

46.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

47.     Recognizing the serious threat the data mining industry poses to

---

[4]     *See* **Exhibit E**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[5]     **Exhibit F**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[6]     **Exhibit G**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

48.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[8]

49.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Sundance share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute

---

[7]     *See* **Exhibit H**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[8]     *Id.*

[9]     *See* **Exhibit I**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

50.     Information disclosures like those made by Sundance are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

51.     Thus, information disclosures like Sundance's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a

---

[10]     **Exhibit J**, Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times,        May        20,        2007,        *available        at* http://www.nytimes.com/2007/05/20/business/20tele.html   (last   visited   July   30, 2021).

[11]     *Id.*

[12]     **Exhibit K**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*   https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf  (last visited July 30, 2021).

specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

52.     Sundance is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the consumer-products industries.

53.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

54.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

55.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14]   As a result,

---

[13]     *See id.*

[14]     *See* **Exhibit L**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wpcontent/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

56.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

57.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[16]

58.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent

---

[15]     *Id.*

[16]     *See* **Exhibit M**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

policies of protecting their data.[17]

59.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]

### *Sundance Unlawfully Rents, Sells, and Otherwise Discloses for Compensation Its Customers' Private Purchase Information*

60.     Sundance maintains a vast digital database comprised of its customers' Private Purchase Information.

61.     Sundance discloses for compensation its customers' Private Purchase Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each Sundance customer, including his or her gender, age, religion, and ethnicity.  (*See, e.g.*, **Exhibit A**).  The "enhanced" customer lists that Sundance receives back from the data aggregators and data appenders are more valuable to Sundance than its original customer lists, and can be sold or rented by Sundance to other third parties for more

---

[17]     *See* **Exhibit N**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[18]     *See* **Exhibit O**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

money than its original customer lists. In this way, Sundance increases its profits gained from its sales and rentals of its customer lists.

62.     Sundance also discloses for compensation its customers' Private Purchase Information to data cooperatives, who in turn disclose or otherwise make available to Sundance their own customer list databases. These third-party customer list databases contain information that is valuable to Sundance, as they enable Sundance to identify prospective customers (i.e., "prospects") to whom it can send advertisements and other offers to sell its tangible and/or intangible property, and with whom it can ultimately enter into consumer transactions with and generate revenue from.

63.     Additionally, Sundance sells, rents, and/or otherwise discloses for compensation its customer lists—which include all of its customers' Private Purchase Information, identifying which individuals purchased Sundance's products, which products they purchased, and the dollar amount of their purchases, and can include the sensitive information (such as gender, age, ethnicity, and religion) obtained from data aggregators and appenders—to numerous other third parties, including other consumer-facing companies, aggressive direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes. (*See* **Exhibit A**).

64.     As a result of Sundance's data compiling and sharing practices,

companies can purchase, rent, or otherwise obtain for compensation customer lists from Sundance that identify Sundance's customers by their most intimate details, including the fact that they purchased Sundance products, which products they purchased and the dollar amount of their purchases, as well as their gender, age, religion, and ethnicity. Sundance's disclosure of such sensitive and private information, to any member of the public interested in purchasing it, is invasive of its customers' (including Plaintiffs' and Class members) privacy and intrusive upon their private affairs and concerns in a way that the average person would find highly offensive. Sundance's disclosures also put its customers at risk of serious harm from scammers.

65.     Sundance fails to provide prior notice of these disclosures to its customers as required by Utah Code Ann. 13-37-201, let alone obtain its customers' consent prior to making such disclosures, and its customers remain unaware that their Private Purchase Information and other sensitive information is being rented, sold, and otherwise disclosed for compensation on the open market.

66.     Since January 1, 2004, Sundance has offered its products for sale through various sales channels, including in its catalogs and on its website. Regardless whether a consumer purchased Sundance's products over the Internet, by telephone, or through traditional mail, since January 1, 2004 Sundance has not required the consumer to read or affirmatively agree to any terms of service, privacy

policy, or information-sharing policy before making their purchase.  Consequently, Sundance has uniformly failed to provide the notice required by Utah Code Ann. 13-37-201 to – much less obtained any form of consent from – any of its customers before they made purchases on Sundance's website or by mail or phone (or before it disclosed their Private Purchase Information to third parties for compensation).

67.     Thus, during the applicable statutory period, Sundance disclosed all of its customers' Private Purchase Information for compensation, to various third parties, without providing advance notice of these practices to its customers.

68.     By and through these actions, Sundance has disclosed to third parties its customers' Private Purchase Information for compensation in direct violation of the NISNPIA.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs seek to represent a class defined as all persons in the United States who, at any point during the applicable statutory period, had their Private Purchase Information, obtained by Sundance on or after January 1, 2004 as a result of a consumer transaction, disclosed to a third party by Sundance (the "Class"). Excluded from the Class is any entity in which Sundance has a controlling interest, officers or directors of Sundance, and any person whose only consumer transactions with Sundance since January 1, 2004 occurred at one or more of Sundance's retail brick-and-mortar stores.

70.     Members of the Class are so numerous that their individual joinder herein is impracticable.  The members of the Class number in at least the hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Sundance.

71.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Sundance is a "commercial entity" within the meaning of the NISNPIA; (b) whether Sundance provided the notice required by the NISNPIA to Plaintiffs and Class members before they entered into consumer transactions with Sundance; (c) whether Sundance obtained Plaintiffs' and Class members' Private Purchase Information as a result of consumer transactions, and whether such information constitutes "nonpublic personal information" within the meaning of the NISNPIA; (d) whether Sundance disclosed Plaintiffs' and Class members' Private Purchase Information to a third party for compensation; and (e) whether Sundance's disclosures of Plaintiffs' and the Class's Private Purchase Information to third parties violated the NISNPIA.

72.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily

protected right to privacy (as afforded by the NISNPIA), as well as instrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Sundance's uniform wrongful conduct in intentionally disclosing their Private Purchase Information to third parties for compensation.

73.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests o the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

74.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Sundance's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Sundance's liability.  Class treatment of the liability issues will ensure

that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSE OF ACTION**
**Violation of Utah's Notice of Intent to Sell**
**Nonpublic Personal Information Act**
**(Utah Code Ann. § 13-37)**

75.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

76.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Sundance.

77.    Sundance maintains its headquarters and principal place of business in Utah, and in the ordinary course of business transacts in consumer transactions in Utah.  Accordingly, Sundance is a "commercial entity" within the meaning of the NISNPIA.  *See* Utah Code Ann. § 13-37-102(2)(a).

78.    On or after January 1, 2004, Plaintiffs purchased consumer products, constituting "tangible" or "intangible" property, from Sundance on its sundancecatalog.com website.

79.    Each of Sundance's sales of tangible and/or intangible property to Plaintiffs (and each of the Class members) was completed in Utah, where at all relevant times Sundance was headquartered and principally did business and the location from which Sundance uniformly shipped to Plaintiffs and the members of the Class the tangible and/or intangible property that they had purchased.

Accordingly, Sundance entered into one or more "consumer transaction" with each of the Plaintiffs and Class members within the meaning of the NISNPIA. *See id.* § 13-37-102(4)(a)(i).

80.    As a result of such consumer transactions, Sundance obtained information pertaining to Plaintiffs and Class members that Plaintiffs and Class members provided at Sundance's request, and which Sundance would not otherwise have obtained but for entering into such consumer transactions with Plaintiffs and Class members. *See id.* § 13-37-201(1)(b). This information, referred to herein as Plaintiffs' and Class members' Private Purchase Information, included Plaintiffs' and Class members' "purchasing habits" and "personal preferences" within the meaning of the NISNPIA.

81.    At various times during the applicable statutory period, Sundance intentionally disclosed Plaintiffs' Private Purchase Information, which identified them as purchasers of Sundance's products, to various third parties for compensation.

82.    Sundance disclosed customer lists containing the Private Purchase Information of all of its customers, including that of each of the Plaintiffs and Class members, to data aggregators and data appenders, who then supplemented the customer lists with additional sensitive information from their own databases, before sending the customer lists back to Sundance. The "enhanced" customer lists that

Sundance received back from the data aggregators and data appenders were more valuable to Sundance than its original customer lists, because the lists that were "enhanced" with the additional information about each customer could be sold or rented by Sundance to third parties for more money. In this way, Sundance was able to increase its profits gained from its sales, rentals, and other compensation-driven disclosures of its customer lists.

83.     Sundance also rented, sold, and/or otherwise disclosed for compensation its customer lists containing all of the Plaintiffs' and Class members' Private Purchase Information—including lists enhanced with the additional personal and demographic information from data aggregators and appenders—to innumerable other third parties, including other consumer-facing companies, aggressive direct-mail advertisers, organizations soliciting monetary contributions, volunteer work, and votes, and others.

84.     Sundance made each disclosure of Plaintiffs' Private Purchase Information, to each of the entities described in the preceding paragraphs, for compensation – namely, money.

85.     The Private Purchase Information Sundance disclosed indicates Plaintiffs' and Class members' names and addresses, as well as the fact that they purchased Sundance's products, the type of products they purchased, and the dollar amounts of their purchases, which was information not otherwise in the public

domain. *See id.* § 13-37-102(5). Because the records or information disclosed by Sundance reveal Plaintiffs' and Class members' "purchasing patterns" and "personal preferences," and "identif[y] [Plaintiffs and Class members] in distinction from other persons," the records or information Sundance disclosed to third parties constitute "nonpublic personal information" within the meaning of the NISNPIA. *See id.* § 13-37-102(5).

86.    At no time before entering into a consumer transaction with Sundance or providing Sundance with their Private Purchase Information did any of the Plaintiffs or members of the Class receive the notice required by Utah Code Ann. § 13-37-201. Specifically, prior to entering into consumer transactions with Plaintiffs and the members of the Class and obtaining Plaintiffs' and Class members' Private Purchase Information, Sundance uniformly failed to provide any of the Plaintiffs or members of the Class with a clear and conspicuous notice in dark bold writing (or orally), such that a reasonable person would perceive the notice, stating that "[w]e may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a).

87.    Plaintiffs and the members of the Class never otherwise consented to Sundance disclosing their Private Purchase Information to anyone.

88.    Sundance's undisclosed, nonconsensual disclosures of all of its customers' Private Purchase Information intruded substantially upon the solitude

and seclusion (including the personal affairs and concerns) of each of the Plaintiffs and Class members, in a way that was highly offensive to Plaintiffs and would be highly offensive to a reasonable person, including members of the Class.

89.     Sundance's disclosures of Plaintiffs' and the Class members' Private Purchase Information were not made to third parties in "relat[ion] to the third part[ies] providing to [Sundance] . . . services, including business outsource services[,] personal or real property[,] or other thing[s] of value," and the "compensation received by [Sundance] as part of the transaction[s] [with third parties] [was not] received by [Sundance] for or in consideration of" such "third part[ies] providing to [Sundance] [such] services, . . . personal or real property[,] or other thing[s] of value." *Id.* § 13-37-201(5).

90.     Sundance is not "subject to a federal law or regulation that governs the disclosure of nonpublic information to a third party," nor is Sundance "a covered entity as defined in 45 C.F.R. Parts 160 and 164." *See* Utah Code Ann. § 13-37-201(4).

91.     By disclosing Plaintiffs' and Class members' Private Purchase Information to third parties for compensation, without having provided prior notice to Plaintiffs or Class members as required by Utah Code Ann. § 13-37-201, Sundance violated Plaintiffs' and Class members' statutorily protected right to privacy in their nonpublic personal information pertaining to their consumer

transactions, as afforded by the NISNPIA. *See id.* § 13-37-202(1) ("A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201.").

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Sundance as follows:

A.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.   For an order declaring that Sundance's conduct as described herein violated Utah's Notice of Intent to Sell Non-Public Information Act;

C.   For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.   For an award of $500.00 to each of the Plaintiffs and each Class member, as provided by the NISNPIA, Utah Code Ann. § 13-37-203(2)(a);

E.   For prejudgment interest on all amounts awarded; and

F.   For an order awarding reasonable attorneys' fees and costs to counsel for Plaintiffs and the Class pursuant to Rule 23 and Utah Code Ann. § 13-37-203(2)(b).

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: May 14, 2024                    Respectfully submitted,

                                       PETERS | SCOFIELD
                                       *A Professional Corporation*


                                       /s/ David W. Scofield
                                       DAVID W. SCOFIELD

                                              -and-

                                       **HEDIN LLP**
                                       FRANK S. HEDIN*
                                       ELLIOT O. JACKSON*

                                       * *Pro Hac Vice* Application Forthcoming

                                       *Counsel for Plaintiffs and Putative Class*